UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DENTAL HEALTH PRODUCTS, INC.,

        Plaintiff,

  v.                                        Case No. 08-C-1039

FRANK RINGO,

        Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dental Health Products, Inc. (DHPI), a Wisconsin corporation, sued its former employee, Frank Ringo, alleging violations of the Computer Fraud and Abuse Act, breach of the duty of loyalty and breach of a non-compete agreement. In a decision and order dated August 25, 2011, I found Ringo liable for the above violations but concluded that establishing damages would require a trial. At the parties' consent, trial was held to the court on September 19, 2011, with Defendant Ringo appearing *pro se*. Upon Plaintiff's motion, I dismissed Ringo's counterclaim on the ground that he had not provided any evidence of damages. What follows are my findings of fact and conclusions of law as to the Plaintiff's claims for breach of the duty of loyalty and breach of a non-compete agreement. I also address the claim for punitive damages.

DHPI is in the business of selling supplies, equipment and services dentists throughout the United States. The submissions and testimony made clear that the business is a profitable one: DHPI sells dental equipment and merchandise at a profit which generally ranges between 28% - 34%. Frank Ringo was a DHPI branch manager and sales representative selling dental supplies to dentists located principally in Illinois and Indiana.

**I. Breach of Duty of Loyalty**

During his six-year tenure (2002-2008) at DHPI, Ringo maintained his own company called J&M Professional Contractors, and in that capacity he sold and installed things like cabinets for dental offices. By 2007, Ringo began purchasing dental supplies and equipment from vendors for J&M with the intention of reselling them to dental customers. Ringo conceded at trial that these sales were made to actual customers of DHPI as well as to customers to whom DHPI otherwise would have been able to sell the same or similar dental supplies. Ringo continued to purchase and sell goods through J&M until September 2008. Ringo's purchase of dental supplies for J&M from various vendors during the period of his employment at DHPI totaled $482,167.61. Steven Bultman, a CPA and DHPI's controller, testified credibly that had these purchases and sales been made through DHPI, it would have earned a profit of 29%. DHPI's loss of profit as a result of Ringo's diversion of sales of dental supplies purchased by J&M totaled $196,941.70. (Ex. 51.) Ringo did not contest these figures.[1]

J&M was not the only company Ringo used to sell dental products during his employment at DHPI. Ringo purchased dental supplies through a company called DESC at a cost of $2,883.27 during the period of his employment at DHPI. He had approached DESC in 2007 with the intent of starting an affiliated business in Illinois (DESC was based in Iowa). The purchases through DESC and the subsequent sales by Ringo were made to actual customers of DHPI as well as to customers to whom DHPI otherwise would have been able to sell the same or similar dental

---

[1]Twenty-nine percent of $482,167.61 is much less than the $196,941.70 in lost profits claimed. That is because the gross figures (e.g., $482.167.61) are not Ringo's *sales* but the amount his company *purchased* from vendors. His gross sales would incorporate any profit he made. Thus, if DHPI had purchased the same amount of product, its gross sales would be $679,109.31. Twenty-nine percent of that is $196,941.70.

2

supplies. Credible testimony established that DHPI would have earned a profit of 34% on these sales if Ringo had sold these dental supplies through DHPI. DHPI's loss of profit as a result of Ringo's diversion of sales of dental supplies purchases through DESC during Ringo's employment with DHPI is $1,485.32.

From the above figures, which were supported by the exhibits and the testimony of Steven Bultman, and which were essentially uncontested by Ringo, I conclude that DHPI lost $198,427.02 in profit that it would have earned if Ringo had not been competing with his own employer during his employment. These damages are all the result of Ringo's breach of his duty of loyalty, as this Court has already found. (Dkt. # 155 at 3-4.)

At the hearing Ringo submitted a case to the Court, *General Automotive Mfg. Co. v. Singer,* (Ex. 10002.) In *Singer,* which this Court cited in its summary judgment decision, the Wisconsin Supreme Court found that Singer had violated his fiduciary duty to act solely in the interest of his employer. 19 Wis.2d 528, 535, 120 N.W.2d 659, 663 (Wis. 1963). Ringo points out that in *Singer,* the employee was under a contract that bound him to "exercise the utmost faith and loyalty" to his employer. *Id.* at 531. Ringo argues that he had no such contract, and he believes the absence of a contract means he was under no duty of loyalty. The time for making such an argument was at the summary judgment stage, of course, but because Ringo is *pro se* I will explain my conclusion that the duty of loyalty has been breached.

First, it is not true that Ringo had no contractual obligations to his employer. In the non-compete agreement he signed in 2002, he agreed that DHPI "has a legitimate interest in protecting the goodwill it has developed with its customers" and further agreed that "I will continue to develop such goodwill on behalf of the Employer." (Ex. 2 at 1.) By agreeing to develop goodwill on behalf

3

of his employer, Ringo was agreeing not to pilfer customers for his own benefit. Moreover, if the non-compete agreement prevents competition with the employer *after* the employment has terminated, surely it is at least implicit in such an agreement that one will not compete with the employer *while* he is employed. After all, it would not make sense to expect one's loyalty to the employer to *increase* after the employment relationship has ended.

Moreover, DHPI noted that its employee handbook, which Ringo acknowledged receiving, contains a prohibition on outside employment that "constitutes a conflict of interest." (Ex. 3 at 19.) Certainly, creating a business that competes with one's employer constitutes the very conflict of interest that the company prohibited.

But all that is just an aside because this case has been tried as a breach of the common law duty of loyalty rather than a breach of contract. Wisconsin case law confirms that a contract requiring loyalty to the employer is not required. This is because the duty does not arise from contract alone but from general and ancient principles of agency law: in short, if one agrees to act as agent (such as a salesman) for a principal, implicit in that agreement is the duty not to work against the principal's interest. Working against one's principal is a tort. For example, the defendant in *InfoCorp, LLC v. Hunt* argued that because he was a salesman who had no contract with his employer, he could not be found liable for a breach of a duty of loyalty. The court of appeals disagreed. It noted that the employee used his position with his employer to steer business and sales to a new potential employer. "A jury could conclude that Hunt's breach of loyalty involved direct harm to his employer because of the manner in which he performed his assigned job duties." 2010 WI App 3, 323 Wis.2d 45, 57, 780 N.W.2d 178, 184 (Wis. Ct. App. 2009). That is the scenario we have here.

4

It is true that in some cases an employee's competition with his employer will not rise to the level of a breach of loyalty. If a greeter at Wal-Mart opens a small booth selling crafts on the weekends, she will not be deemed disloyal. But here we have a key company employee competing for key aspects of his employer's business. Steven Bultman credibly testified (and Ringo did not dispute) that Ringo was one of the top five salesman in the company, and Ringo also held various management positions with DHPI. He admitted that the products he sold on the side were available from DHPI and he sold them to DHPI clients. The sales he made were directly within the heartland of DHPI's business model. At trial, counsel for DHPI said that the company had been "robbed" by Ringo, and perhaps that is too strong, but the unrefuted evidence shows that the sales Ringo made on the side to DHPI clients were sales that DHPI itself would have made but were prevented from making by the secret actions of its employee. It was a zero-sum situation: the sales Ringo made for himself equaled the losses to his employer. If company salesmen can moonlight on their own and use their positions to divert business from their employer, then the duty of loyalty has no meaning at all. The breach here was clear, and so are the damages.

**II. Breach of Non-compete Agreement**

Above I have found Ringo liable for damages he caused DHPI during the term of his employment, which ended August 1, 2008. After that date, Ringo was subject to a non-compete agreement that prevented him from "contact[ing] for the purposes of selling dental supplies any of the Employer's customers with whom I had direct and regular contact while employed by the employer." (Ex. 2 at 2.)

Ringo did not deny contacting several DHPI customers for the purposes of selling them dental equipment. DHPI presented evidence that Ringo purchased dental supplies at a cost of

5

$31,418.99 through his J&M company from various vendors during the period of the non-compete agreement. These products would then have been resold to clients, most of whom were DHPI clients, in violation of the non-compete agreement. In addition, Ringo's wife had set up a new company called DESI, which purchased dental products at a cost of $233,781.05. Ringo and his wife resold these products primarily to DHPI clients. DHPI lost more than $109,000 in profits on these sales.

Ringo's principal defense is based on his interpretation of the non-compete agreement. In particular, he notes that the agreement precluded him from selling "supplies" to dentists, whereas the only things he sold after leaving DHPI were "equipment" like cabinets, dental chairs, and the like. He testified that dental supplies are things like toothbrushes and gloves, as opposed to things more permanent and substantial. Supplies are things that go in a cabinet (e.g., a "supply cabinet"); they are not the cabinet itself. DHPI did not dispute that the general meaning of "supplies" would normally exclude the kinds of things Ringo sold. Its own witnesses used the term "merchandise" to distinguish such items from equipment. And in fact two of the companies named as defendants in this lawsuit have the terms "equipment" *and* "supply" in their names, suggesting that the term "supply" does not encompass the equipment items Ringo sold.

But DHPI protests that such a narrow reading would not make sense: why would the company prohibit the selling of supplies during a non-compete period but allow an ex-employee to compete against it in the equipment market? There is no practical business reason for such a distinction. Moreover, Lisa Benson, a human resources employee at DHPI, testified that before Ringo signed the agreement in 2002 she had told him that "supplies" meant "everything" that DHPI sold.

I did not find either of these arguments persuasive. First, I agree with Ringo that it is difficult to believe Benson would have such a clear memory of a relatively mundane conversation they had nine years ago, and Benson's explanation was not wholly convincing. In addition, DHPI started out as a supply company (it started out selling gloves to dentists), and so it is reasonable to believe that the non-competition agreement it created at some point before Ringo started in 2002 was deliberately limited to "supplies" because that was all the company sold. It is likely that the company simply failed to update its non-compete agreement as the company's sales portfolio grew. For these reasons, I find it unlikely that Ringo and Benson had come to some kind of private understanding that "supplies" had a much broader meaning than is commonly understood.

Regardless of whether Benson is believed or not, however, an HR employee's oral explanation of an otherwise-clear contractual term cannot change the meaning of that term. After all, the entire purpose of committing an agreement to writing is to prevent later disputes about who said what. Imagine the chaos that would ensue if the plain language of every contract could be altered by private and ancient conversations about word meanings. The parol evidence rule prevents the use of extrinsic evidence to explain plain contractual terms. *Louis and Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.,* 616 F.3d 618, 622 (7th Cir. 2010) ("an unambiguous contract should be given its plain and ordinary meaning . . . and no extrinsic evidence is admissible to explain the terms of such an agreement.") DHPI argued that the extrinsic evidence about the meaning of "supplies" could be admitted because the term is ambiguous. But "supplies" is not ambiguous. As noted above, everyone in the courtroom seemed to treat supplies like toothbrushes differently from the kinds of things Ringo was selling after he left DHPI. It may be debatable whether a given product constitutes a "supply" or "equipment" or something else, but such line-

7

drawing exercises are common with generic nouns like "supply." For example, if a contract prevented someone from selling fruit, it would be debatable whether that person could sell tomatoes. But no one would claim that the injunction against fruit sales would apply to spinach or carrots. The fact that there is some room for debate at the margins of a term in specific instances does not render the term "fruit" ambiguous, and neither do any debates about the term "supplies." Here, Benson's testimony might be helpful in explaining any contractual ambiguity, but it does not itself *create* such an ambiguity. "The fact that parties to a contract disagree about its meaning does not show that it is ambiguous, for if it did, then putting contracts into writing would provide parties with little or no protection." *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.,* 877 F.2d 614, 621 (7th Cir.1989). Ultimately, no one testified that there was any ambiguity in the term "supplies," and in fact most of the witnesses treated supplies differently from equipment. Accordingly, I conclude that the non-compete agreement does not apply to the products that Ringo sold after he left DHPI.

## III. Punitive Damages

DHPI also sought punitive damages for what it describes as Ringo's intentional disregard of its right to have him act as its exclusive agent. Ringo has not argued that such damages are inappropriate, although because he is *pro se* it is proper to examine the basis for such a claim. The case of *Everbrite Elec. Signs, Inc. v. Yezzi* is instructive. 144 Wis.2d 949, 425 N.W.2d 39 (Wis. Ct. App. 1988). There, unbeknownst to the employer, two employees set up a business to handle the employer's excess trucking needs. These employees directed the employer's trucking needs to their own company and thereby earned a profit of some $84,000. When the employer found out, it sued the employees for breach of loyalty and sought disgorgement of the employees' profits. The trial court awarded punitive damages, but the court of appeals reversed. The court found that the

employer was not actually damaged itself because it did not lose any business as a result of the employees' breach of loyalty. The employer was not in the trucking business itself, but was merely a customer of the company its own employees set up. Because it was not actually damaged, the employer was seeking equitable relief (disgorgement) rather than compensatory damages. Thus, the disgorgement of the employees' profits was not compensatory damages but a kind of equitable punishment for the employees' breach of loyalty. The court concluded that allowing punitive damages on top of that equitable penalty would be a double punishment, and it therefore reversed the award of punitive damages.

Here, the employer is not seeking disgorgement of Ringo's profits. It is instead seeking compensatory damages to make it whole for the amount of money *it* lost as a result of Ringo's conduct. *Id.* ("The disloyal agent is therefore subject to two possible sanctions: (1) compensation to its principal for the actual damages suffered and (2) disgorgement of ill-gotten gains.") When compensatory damages are awarded, as here, punitive damages are allowable. *Id.*

The next question is whether Ringo's actions meet the evidentiary threshold for punitive damages. Under Wis. Stat. § 895.043(3), a plaintiff must show that a defendant acted maliciously toward the plaintiff or intentionally disregarded the rights of the plaintiff. This does not necessarily mean that the defendant intended to cause harm or injury to the plaintiff. *Wischer v. Mitsubishi Heavy Indus. Am., Inc.,* 2005 WI 26, ¶ 61, 279 Wis.2d 4, 694 N.W.2d 320 (Wis. 2005). Any award of punitive damages must be no more than necessary to serve the purposes of such an award, and the award must be proportional to the wrongdoing. *Trinity Evangelical Lutheran Church and School–Freistadt v. Tower Ins. Co.,* 2003 WI 46, ¶ 46, 261 Wis.2d 333, 661 N.W.2d 789 (Wis. 2003). DHPI asks for some $715,000 in punitive damages, which is presumably calculated based

on twice the compensatory damages it sought. The compensatory damages actually awarded here are $198,427.02. Twice that amount would be $396,854.04.

In *D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson,* the Wisconsin Supreme Court addressed a violation of a non-compete agreement arising out of the sale of a business. Anderson sold his business and agreed not to compete with the new owner within 120 miles for an extended period of time. 2008 WI 126, 314 Wis.2d 560, 599, 757 N.W.2d 803 (Wis. 2008). Soon enough he re-entered the business and began competing with the business he sold, even using the "Anderson" name to foster familiarity with potential and former clients. The court found that this fact would allow a jury to reasonably conclude that he had acted in intentional disregard of the plaintiffs' rights. Moreover, Anderson's failure to abide by the non-compete was so egregious that the trial court chastised him as follows: "[Y]ou've got a world of hurt coming at you, sir. . . . I don't know what it's going to take to stop, but every time there's a line drawn, you seem to go right up to it and over it." *Id.* at ¶ 86. Given the jury verdict against Anderson and the judge's finding that his conduct was extreme, the supreme court found that the award of punitive damages in the amount of $180,000 (twice the compensatory award) was appropriate.

Here, Ringo essentially conceded that he was intentionally disregarding his employer's rights. At the trial, by way of justification for his conduct, Ringo reiterated his view that the clients he sold products to were "his" clients, rather than DHPI's, because he had worked with them for years and many of those relationships pre-dated his employment at DHPI. Although that attitude evidently allowed Ringo to rationalize taking his employer's business, it is not justification for his conduct. Many salesmen and others in the service industry (lawyers, physicians, etc.) no doubt share Ringo's view that their relationship with their clients is more personal than corporate. They

10

are the ones who generate leads, do the legwork, take clients to dinner, travel, etc. Having clients follow a salesman from one employer to another is nothing new. But salesmen in that situation generally recognize that their business is part of a shared enterprise and that although they may have developed the customer relationships, the customer is a client of the firm rather than the individual. If Ringo wanted his clients to truly be "his," the thing to do was to start his own company *after* leaving DHPI, not to create a covert enterprise under DHPI's nose. Instead, Ringo apparently wanted it both ways: to have a stable job as a salesman for a larger company, but also to be able to poach his company's clients at his employer's expense. Ringo likely would have continued his efforts as long as he could to build up as large a business as possible before venturing out on his own. But employers are not incubators for their employees' competing businesses, and even Ringo knew that.

In addition, there was credible testimony that upon leaving the company Ringo told Lisa Benson that DHPI's owners could "wipe their ass" with the non-compete agreement. Ringo did not deny saying this and simply noted that he was probably angry at the time. Although above I found the non-compete inapplicable here, Ringo's comments about the agreement support my conclusion that he viewed himself has having some kind of entitlement to compete with his employer. This attitude and the nature of his conduct convinces me that Ringo's actions in competing with his employer were done in intentional disregard for his employer's rights.

The question is what amount would suffice to punish the offense. As a starting point, in my view doubling the compensatory damages to $396,854.04 would be excessive. The facts in *Anderson* were somewhat more egregious than we have here. Anderson sold his business for nearly a million dollars and then turned around and competed with that business. In the context of a sale

11

of a business, the non-compete can be crucial to the new owners' ability to make the business survive and thrive. Thus, in *Anderson* damages were awarded for disparagement of the sold business's trade name in addition to the non-compete violation. In short, Anderson's actions threatened the very viability of the business he sold, and the trial judge found his behavior contemptible. Here, it may be argued that stealing business under the nose of one's employer *while employed* is just as sordid, but Ringo's actions, while tortious, did not threaten DHPI's survival. In addition, there is no hint here that Ringo's actions were malicious or egregious; he was simply trying to make a dishonest buck for himself through what appears to be a garden-variety breach of loyalty. While this is bad enough in itself, I conclude that a punitive damages award of double the compensatory damages would be excessive.[2]

Instead, I am satisfied that an award roughly equal to half the compensatory damages for Ringo's breach of his duty of loyalty to his employer, or $100,000, is appropriate. It is a significant amount likely to deter similar conduct in the future both by Ringo and others who might be tempted to engage in it. It is true that there was no testimony as to Ringo's finances and ability to pay such an amount. *See Anderson,* 2008 WI 126, ¶ 80 (wealth of the wrongdoer is relevant). He appeared *pro se* after his attorneys moved to withdraw because Ringo could not, or would not, pay their fees. It was clear from the evidence, however, that he was able to make significant profits as a salesman of dental equipment through the various clients he had accumulated over the years. It is also noteworthy that throughout the same period of time that Ringo was diverting sales from his

---

[2]In *Anderson* the Supreme Court was not expressing a view that double damages was the "correct" amount of punitive damages. It merely found that such an amount was not excessive under the Due Process Clause. Thus *Anderson* and other punitive damage cases are not strict benchmarks to be used for comparison but are merely guides suggestive of reasonable ranges and factors to consider.

12

employer, he remained one of DHPI's top salesmen, thereby indicating that his breach was not as egregious as it might have been. On the other hand, DHPI incurred substantial legal fees and other expenses, including lost time of its professional staff, in its efforts to investigate the extent and recover the losses caused by Ringo's disloyalty. Half the amount of profits Ringo diverted from the company during the period of his employment is a fair award that is commensurate with the severity of his wrongdoing; it is also serious enough to deter such conduct without being too onerous that it would offend Due Process.[3]

**IV. Conclusion**

For the reasons given above, I conclude that Plaintiff is entitled to judgment awarding it $198,427.02 for breach of the duty of loyalty. It is further awarded damages of $15,865.88 for Ringo's violations of the Computer Fraud and Abuse Act. In addition, Plaintiff is entitled to judgment awarding punitive damages in the amount of $100,000. Defendants' counterclaims are dismissed. The motions *in limine* are denied as moot. Claims against Defendant DESI are dismissed. The Clerk is directed to enter judgment in favor of Plaintiff DHPI and against Defendant Frank Ringo in the total amount of $314,292.90 together with costs.

**SO ORDERED** this   30th   day of September, 2011.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

[3]Initially DHPI also sought disgorgement of what it viewed as its overpayment of salary to Ringo during the period he was competing with the company. But counsel conceded that such a result would produce a double recovery. That is, if the company recovers the profits Ringo would have earned for it, it cannot also recover the amounts it was paying Ringo during that period. Recovery of the lost profits suffices to make the company whole.